UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD C. SHAW, *et. al.*<br><br>Defendants. | Case No. 2:16-cv-0220-KJD-NJK<br><br>ORDER |

Presently before the Court is Plaintiff's Motion for Summary Judgment (#65). Defendant filed a response in opposition (#70) to which the United States replied (#72). Also before the Court is Defendant Rose Shaw's Motion for Partial Judgment on the Pleadings (#68). Plaintiff filed a response in opposition (#69) to which Defendant Rose replied (#71).

**I. Facts**

Defendant Richard Shaw (hereinafter "Shaw") failed to prepare and file timely income tax returns for the 1999, 2000, 2003, and 2004 tax years. For the 1999, 2000, and 2003 tax years, taxes were assessed based on information collected by the IRS from third parties, such as information put forward on Form 1099-MISCs that report money paid to individuals by companies for contracting work, among other possible sources. For the 2004 tax year, the taxes were initially assessed by examination, and Shaw then filed a return showing that amount of taxes as being properly owed for that year.

In 2008, returns for the 2000, 2002, and 2003 tax years were filed with the IRS on Richard Shaw's behalf, with zeroes entered in the lines for various forms of income. With those documents were filed purportedly "corrected" Form 1099-MISCs, also reporting Richard Shaw as having received zero income from each recipient that year. Regardless of who completed the

returns, eventually Richard Shaw signed off on them. Richard Shaw and his wife, Rose Shaw (hereinafter "Rose"), admit that during those years Richard Shaw actually received money for the services he provided, contrary to the numbers reported on their "zero" returns and the "corrected" Form 1099-MISCs. The basis for Richard Shaw reporting zero income on their returns were the ideas in the book Cracking the Code, by Pete Hendrickson, effectively stating that income from services is not taxable. This argument has repeatedly been found by courts to be frivolous.

In 2016, Richard Shaw filed new returns for a number of tax years, including the years at issue here (1999, 2000, 2002, 2003, and 2004). In those documents, he reported numbers higher than zero, but lower than the amounts assessed. During his deposition, he testified that the basis for those numbers may have been "guesstimates," but that Rose helped him fill the documents out. Rose Shaw testified that some of the numbers may have been guesstimates, but some of them may have been based on receipts or other documents. The United States did submit written discovery requesting receipts or other corroborating information, but never received any such documents with Defendants' discovery responses. With interest calculated to October 31, 2017, the amount owed on the taxes, penalties, and interest for the years and periods at issue is: $172,809.47 for the 1999 tax year; $160,852.93 for the 2000 tax year; $28,349.50 for the 2003 tax year; $23,931.39 for the 2004 tax year; $6,390.97 for the 2003 civil penalty period; and $6,391.65 for the 2002 civil penalty period. The total, for all those periods, is $398,725.91.

Richard and Rose Shaw originally purchased the Nevada property in 1992. They took out a mortgage to purchase the property, and used their money to make the deposit and make payments on the mortgage. Richard and Rose Shaw purchased the Florida property in 1999, and similarly made mortgage payments on the property after the purchase.

In 2004, Saint Andrews Ivy, B.T. ("Saint Andrews Ivy"), was formed as a business trust. Saint Andrews Ivy's address is at the Nevada Property where Richard and Rose Shaw currently live. According to Richard Shaw, the trust was actually created "as a family preservation type trust," and Richard and Rose "put the properties in there so the kids would be able to use these properties forever if Rose and I left the world, and they would have use without inheritance taxes

and all that." As Saint Andrews Ivy's 30(b)(6) designee, Vanessa Shaw (Richard and Rose's daughter), said at its deposition, the purpose of the trust was to "protect our assets," and "to bring it down to our family generations for our kids from probate or if they die and it gets stuck with the state." The role of the trustee, according to Saint Andrews Ivy, was "to protect the trust from any third party or governmental agencies."

The trust documents list Vanessa Shaw, as the first trustee, and Travis Shaw (Richard and Rose's son), as her only co-trustee, while Rose Shaw was the trust's secretary and Richard Shaw was the trust's managing director. Vanessa Shaw was also Saint Andrews Ivy's 30(b)(6) designee at its deposition. However, the "certificate of trust" filed with the Nevada Secretary of State to formally create the business trust lists Richard Shaw and Rose Shaw as the only trustees (with their signatures) and Travis Shaw as their registered agent. Similarly, the "initial list of trustees" filed with the Nevada Secretary of State lists Richard Shaw and Rose Shaw as the only trustees.

At the creation of the trust, Richard Shaw was "trust exchanger" which, according to Richard Shaw, meant that he was the person who put property into the trust at formation. Richard Shaw explained that the purpose of the exchanger was "to exchange the property for trust certificates." At the time of formation, no money went into the trust, just the three pieces of real property and all the furniture in the real property (including tools, electronics, and a baby grand piano).[1] The non-real property transferred to Saint Andrews Ivy consisted of all the items and furniture on the real property at the time of transfer. There was never a formal purchase-and-sale agreement where the trust purchased the property, and the Shaws never received any money from the transfer of the properties to Saint Andrews Ivy. However, after the transfer, the Shaws did have the use of the real property, as well as the use of all the personal property transferred to the trust.

---

[1] In addition to the Nevada property, with which this case is concerned, and the Florida property, which the United States has obtained a default judgment stating that Saint Andrews Ivy holds as nominee or alter ego as Richard Shaw, the Shaws also transferred a small piece of property in Arizona to Saint Andrews Ivy, B.T. That piece of property is not at issue in this case.

- 3 -

After transferring the property to the trust, Richard Shaw "did not have any other assets other than some tools." Rose Shaw stated that, after the transfers of property to the trust, she did not own any substantial property. Richard Shaw testified that there were no beneficiaries of the trust "other than the children," but he "d[id]n't know if you call them[, the children,] a beneficiary." As Richard explained it, the only role of Richard and Rose Shaw's children (Vanessa and Travis) in the trust was as trustees. Rose Shaw testified that here were no trustees apart from Richard Shaw and Rose Shaw (early on), and Vanessa Shaw and Travis Shaw.

While the trust never paid Richard or Rose Shaw any money for the properties transferred to it (including the Nevada property at issue in this case), Richard and Rose did originally receive "trust certificate units" ("TCUs") from the trust. According to Rose Shaw, TCUs were a form of ownership of the trust, TCUs were basically the right "[t]o hold the property, the assets, to hold the assets until their contract is done." Thus, if the trust was liquidated, then the holders of the TCUs would get proportionate shares of the trust's assets. According to the trust documents TCUs represent 100% of the rights to distribution from the organization's trust estate, whoever holds the TCUs is "entitled to a proportionate share of all distributions declared or made in the ordinary course of business." The trust documents also explain that the purpose of the trust itself was to hold and manage property "for the benefit of certificate holders."

The trust issued 20 TCUs to Richard and Rose for the Nevada Property, 20 TCUs to them for the Florida property, and 10 TCUs for the Arizona property, but ultimately 60 TCUs were issued to Richard and Rose Shaw, total (and no others were issued). However, Richard and Rose then transferred those TCUs back to Saint Andrews Ivy, without receiving any compensation whatsoever. Thus, according to the Trust's own documents, Saint Andrew's Ivy, is the sole owner of its own TCUs, meaning it is the only person or entity with the rights to distribution of its assets if it is dissolved.

Despite being formed as a business trust, Saint Andrews Ivy never conducted any business. Saint Andrews Ivy never made any profit, and its only purpose was to manage the three properties transferred to it at formation. Saint Andrews Ivy did not keep any books or records, had no bank account, kept no quarterly reports, filed no tax returns and no income passed

through the trust to the trustees. There were no electronic records, either, and Saint Andrews Ivy did not have a bank account in its own name. While the trust statement explained that the trustees and officers "shall be independent contractors and shall execute a written contract with the company," the trustees and officers never executed such an agreement.

Since the Nevada and Florida properties were transferred to Saint Andrews Ivy, Richard and Rose Shaw have lived in those two properties (and, with one possible exception—Rose Shaw's suggestion that they might have rented another property in Fort Myers "temporarily"—only those two properties) rent-free. When the properties were renovated, the renovations and painting were primarily done by Richard Shaw (the only exception being a re-roofing), who also supplied the paint and the "normal stuff" for those renovations. The new roof was paid for with an insurance payout. The only people to live in the Nevada property after the "transfer" to Saint Andrews Ivy were Richard Shaw, Rose Shaw, and possibly members of their family (at some point, Travis and his then-wife lived there). Similarly, Richard and Rose Shaw were the primary residents of the Florida property after the transfer, with a neighbor casually living there for three months at one point. While the neighbor did apparently pay rent, that rent was never reported as taxable income by anyone: not by the Shaws, and not by Saint Andrews Ivy or its trustees.

The utilities and loans related to the Nevada property (and the Florida property) are currently paid out of an account in the name of Cannen, LLC. Richard and Rose Shaw are the only signatories on that account, and are the only people who make decisions on whether to make a payment out of that account. The money in that account comes from Richard Shaw's inheritance. Saint Andrews Ivy does not, itself, provide any money to make payments on the loans. They use that account to pay not only the expenses related to the Nevada and Florida properties, but also their personal expenses. Rose Shaw did state that she only paid the property expenses out of that account on the basis of a directive from the Saint Andrews Ivy trustee telling them to make those payments. But Richard and Rose make the decisions to make payments for personal expenses. Cannen, LLC is a Nevada entity with Richard Shaw, Rose Shaw, and Vanessa Shaw listed as its only managers or managing members.

Previously, payments related to the property were made out of a bank account in the name of R&R Adjusters, LLC, an entity created in 2004 with Richard and Rose Shaw listed as the only managers or managing members. The "R&R" in "R&R Adjusters" stands for "Ric and Rose." Rose believed the source of the funds for that account were "something we [the Shaws] had earned from something." Richard, Rose, and Travis were all signatories on the account, and each of them had the power to make decisions regarding what was paid.

On or around March 17, 2014, Rose Shaw filed a "Certificate of Cancellation for a Nevada Business Trust," on behalf of Saint Andrews Ivy, as Saint Andrews Ivy's trustee. The basis for the cancellation was that "it has been determined due to the lack of business transactions or the anticipation of the same, this trust is cancelled." Richard Shaw stated that that document cancelling the trust was filed "so that we did not have to register, and "[w]e didn't want to pay the hundred dollars a year," when the entity was not doing business.

On June 2, 2016, Richard Shaw filed for bankruptcy. In his bankruptcy petition, he listed the holders of the mortgages on both the Nevada and Florida properties as his creditors, explaining that he was the beneficiary of a trust created 4/16/2004. Saint Andrews Ivy was created in March 2004, but has no beneficiaries listed. Richard Shaw both said that there are no beneficiaries of Saint Andrews Ivy, and that it "sounds like" he is the beneficiary of the trust. Rose stated that there were never any trust beneficiaries. The 30(b)(6) representative, Vanessa Shaw, said that the role of the trustee was to protect the assets of the trust and "taking care to distribute to the beneficiaries," but she also stated that there were no beneficiaries of the trust.

On June 28, 2017, the U.S. District Court for the Middle District of Florida entered an order, after the defendants' default, setting aside the transfer of the Florida property to Saint Andrews Ivy as "fraudulent and void," and finding that "Saint Andrews Ivy is the nominee or alter ego of Richard Shaw, and accordingly, the federal tax liens are properly attached to Richard Shaw's interest in the Florida Parcel."

On February 29, 2016, the Government filed the present action in the District of Nevada seeking the following relief: (1) a declaration that pursuant to 11 U.S.C. § 523 Richard Shaw's federal tax liabilities for 1999, 2000, 2003 and 2004 were not discharged in bankruptcy; (2) a

judgment against Richard Shaw for the unpaid balance of the assessed amounts pursuant to 26 U.S.C. § 7402(a); (3) a finding that the United States' tax liens have priority over Saint Andrews Ivy, B.T., because Saint Andrews was not a bona fide purchase in good faith; (4) a finding that the purported transfer of the Nevada Parcel was a fraudulent conveyance and is voidable pursuant to N.R.S. § 112.180(1)(a)&(b); (5) a finding that the Nevada parcel is held by Saint Andrews as the nominee or alter ego of Richard Shaw to which the federal tax liens attach; and (6) foreclosure of the federal tax liens against the Nevada Parcel.

Plaintiff then filed the present motion for summary judgment. Defendant Rose Shaw filed her motion for partial judgment on the pleadings seeking a determination that her interest in the property has not been affected by the allegations of the complaint.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. The burden then shifts to the nonmoving party to set forth specific facts demonstrating a genuine factual issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

All justifiable inferences must be viewed in the light must favorable to the nonmoving party. See Matsushita, 475 U.S. at 587. However, the nonmoving party may not rest upon the mere allegations or denials of his or her pleadings, but he or she must produce specific facts, by affidavit or other evidentiary materials as provided by Rule 56(e), showing there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The court need only resolve factual issues of controversy in favor of the non-moving party where the facts specifically averred by that party contradict facts specifically averred by the movant. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345 (9th Cir. 1995) (stating that conclusory or speculative

testimony is insufficient to raise a genuine issue of fact to defeat summary judgment). Evidence must be concrete and cannot rely on "mere speculation, conjecture, or fantasy." O.S.C. Corp. v. Apple Computer, Inc., 792 F.2d 1464, 1467 (9th Cir. 1986). "[U]ncorroborated and self-serving testimony," without more, will not create a "genuine issue" of material fact precluding summary judgment. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).

Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Summary judgment shall not be granted if a reasonable jury could return a verdict for the nonmoving party. See Anderson, 477 U.S. at 248.

**III. ANALYSIS**

**A. Defendant Richard Shaw's Tax Liability**

In an action to collect taxes, the initial burden falls on the Government. Oliver v. United States, 921 F.2d 916, 919 (9th Cir. 1990). The initial burden is met by introducing into evidence its assessment of taxes due. Id. "Normally, introduction of the assessment establishes a prima facie case." Id. Here, the United States has introduced the Form 4340s for the tax years in question. Further, the Government has introduced evidence, the Form 1099 information sent to the IRS by third parties, linking Shaw to the income-producing activity. For the 2004 tax year, the United States introduced a late tax return submitted by the Shaws asserting the amount of taxes assessed by the IRS.

The Court finds that the United States has provided prima facie evidence of income, shifting the burden to Richard Shaw to show that the assessment is "arbitrary or erroneous[.]" United States v. Stonehill, 702 F.2d 1288, 1294 (9th Cir. 1983). If Shaw successfully rebuts the presumption of correctness, the burden shifts back to the Government to "establish the correctness of the evidence by sufficient and competent evidence." United States v. Molitor, 337 F.2d 917, 923 (9th Cir. 1964).

However, the Court finds that Shaw's reliance on estimates, in his own words "guesstimates" of his potential deductions have not rebutted the presumption of correctness.

"[A]n income tax deduction is a matter of legislative grace and . . . the burden of clearly showing the right to the claimed deduction is on the taxpayer." INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 84 (1992). The Internal Revenue Code permits deductions for business expenses. 26 U.S.C. § 162(a). That statute has five elements. The "item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." Comm'r v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 352 (1971). Shaw failed to show that he met "every condition of . . . [each] deduction" he claimed. Davis v. Comm'r, 394 F.3d 1294, 1298 n.2 (9th Cir. 2005).

While taxpayers are allowed to take certain business expenses, the law requires taxpayers to substantiate them. 26 U.S.C. § 274(d). The deduction cannot be allowed unless the substantiation requirement is met, which Shaw failed to do. § 274(d). Specifically, the law requires "adequate records or . . . sufficient evidence corroborating the taxpayer's own statement" to show the business purpose of the expense. Id; 26 C.F.R. § 1.274-5T(b)(2)(iv). The regulations favor contemporaneous written records, noting that they have "a high degree of credibility not present with respect to a statement prepared subsequent thereto when generally there is a lack of accurate recall." 26 C.F.R. § 1.274-5T(c)(1); see also Reynolds v. Comm'r, 296 F.3d 607, 615-16 (7th Cir. 2002) (explaining that taxpayers without "[c]omplete, contemporaneous records . . . will have to present evidence that is equally credible and probative, which will be difficult").

While crediting non-movant Defendants' testimony that some records had been destroyed in 2004, Defendants rely solely on their own self-serving testimony regarding potential deductions and not on credible, probative contemporaneous records to corroborate their deductions. "If evidence to establish a deduction is lacking, the taxpayer, not the government, suffers the consequence." Talley Industries Inc. v. Comm'r, 116 F.3d 382, 387-88 (9th Cir. 1997). Therefore, the Court grants Plaintiff's motion for summary judgment and holds that Defendants are liable for taxes assessed for the years in question.

///

///

**B. Penalties & Interest**

Additionally, the United States is entitled to penalties and interest on Shaw's tax liabilities. Federal law imposes a penalty on taxpayers who understate their tax if one or more of several criteria are met. See 26 U.S.C. § 6662(a), (b). This penalty, known generically as an "accuracy-related penalty," is equal to 20% of the amount of the underpayment. Id. § 6662(a). An accuracy-related penalty applies when a taxpayer's underpayment results from a "substantial understatement of income tax." 26 U.S.C. § 6662(b)(2). An "understatement" is the amount of tax required to be shown on the return less the amount shown. Id. § 6662(d)(2)(A). It is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Id. § 6662(d)(1)(A); see also 26 C.F.R. § 1.6662-4. The Government has met its burden of production under § 7491(c) by establishing that there was a deficiency in tax that exceeded the statutory threshold. See, e.g., Brennan v. Comm'r, T.C. Memo 2012-209, 2012 WL 3000336 (Tax Court 2012). Specifically, for the year 2000, accounting for abatements, the assessed amount was $50,436.00. However, Shaw understated his tax by submitting a return that showed zeroes where income should have been reported.

Also, Shaw is liable for estimated tax penalties for the years 1999, 2000, 2003 and 2004. Each year, taxpayers are generally required to remit four estimated income tax payments (requirements usually satisfied by wage withholdings). See 26 U.S.C. § 6654(c), (d). The payment must be at least the lesser of (1) 90% of the tax due for the year or (2) 100% of the tax due for the previous year. § 6654(d). Federal law imposes a penalty when the payments are not made. § 6654(a). The penalty is mandatory unless the taxpayer shows that an exception applies. E.g., Harris v. Comm'r, 104 T.C.M. (CCH) 554 (2012). The United States has satisfied its burden of showing underpayment of their estimated tax, through the certified records of the assessments. Therefore, Shaw is liable for the estimated tax penalties for the specified years.

Next, federal law imposes a monthly penalty of 0.5% of any tax shown on a return, but not paid. 26 U.S.C. § 6651(a)(3). It imposes the same penalty if a tax required to be shown on a return is not paid following notice and demand. Id. § 6651(a)(3). The penalties cannot exceed

25% of the total tax due. See id. § 6651(a)(2), (3).[2] The United States met its burden of production by showing that tax was shown on a return, or was required to be shown, but was not paid following its demand. See, e.g., Wheeler v. Comm'r, 127 T.C. 200, 208-10 (2006). Here, Shaw did not promptly pay the taxes owed for the 1999, 2000, 2003, and 2004 tax years on demand of the government, despite owing those taxes. Therefore, Shaw is liable for the failure-to-pay penalties assessed for those years.

In addition to the failure-to-pay penalties, federal law imposes a monthly penalty of 5% on the amount of owed, where the taxpayer fails to timely file a return. 26 U.S.C. § 6651(a)(1). The penalty cannot exceed 25% of the total tax due. § 6651(a)(1). The United States has met its burden of production by showing that the taxpayer failed to file tax returns on time. See, e.g., Higbee v. Comm'r, 116 T.C. 438, 447 (Tax Court 2001). Here, the Form 4340s are presumptive proof that Mr. Shaw did not file his returns for 1999, 2000, 2003, and 2004 within six months of them being due. Therefore, Mr. Shaw is liable for the late return filing penalties for the specified years.

Finally, under 26 U.S.C. § 6702, "[a] person shall pay a penalty of $5,000" if they file "what purports to be a return of a tax imposed by this title but" either "does not contain information on which the substantial correctness of the self-assessment may be judged," or "contains information that on its face indicates that the self-assessment is substantially incorrect." 26 U.S.C. § 6702(a)(1). In addition, the position taken must be one "which the secretary has identified as frivolous" or "reflects a desire to delay or impede the administration of federal tax laws." 26 U.S.C. § 6702(a)(2). Courts have "repeatedly characterized returns reflecting zero income and zero tax as frivolous." Grunstead v. Comm'r, 136 T.C. 455, 460 (Tax Court 2011).

Thus, tax returns with zeros in the income section where income actually existed are "substantially incorrect and frivolous, thus making [taxpayers] liable for the frivolous return penalty." Lemieux v. United States, 230 F.Supp.2d 1143, 1146 (D. Nev. 2002). Here, the United

---

[2] A so-called "substitute for return" prepared by the IRS under 26 U.S.C. § 6020(b) counts as a "return" under § 6651(a)(2) and (a)(3), and not under (a)(1). 26 U.S.C. § 6651(g).

- 11 -

States has assessed the frivolous return penalties for the years at issue, for returns submitted to the IRS in 2008 (but for the 2002 and 2003 tax years). Those returns show zeroes listed as income; with those returns were submitted "corrected" Form 1099s that Mr. Shaw admitted he had modified in order to show zeroes on the amount he purportedly received from each entity. Mr. Shaw has since submitted returns that he contends are more accurate, that do reflect him having received income. Mr. and Mrs. Shaw stated that the reason they submitted the "zero" returns were because of positions taken in a book called Cracking the Code, positions that numerous courts have found to be frivolous. See, e.g., Waltner v. Comm'r, T.C. Memo. 2014–35, 2014 WL 775179 (Tax Court 2014) (imposing sanctions on litigant for making frivolous arguments where litigant "appear[ed] to be perpetuating frivolous positions that have been promoted and encouraged by Peter Hendrickson's book Cracking the Code."); United States v. Hendrickson, 664 F.Supp.2d 793 (E.D. Mich. 2009) (denying the motions to dismiss the indictment of defendant (author of Cracking the Code)). Therefore, Shaw is liable for the assessed frivolous return penalty.

**C. The Nevada Property**

**1. Saint Andrews Ivy Holds Nevada Property as Nominee of Shaw**

A tax lien arising out of unpaid taxes attaches to all property (or rights to property) held by a taxpayer, "including property that is held by a third party as the taxpayer's nominee or alter ego." Fourth Inv., L.P. v. United States, 720 F.3d 1058, 1066 (9th Cir. 2013). The nominee inquiry is a state-law inquiry, id. at 1068, and here, the Court looks to the Nevada nominee doctrine to see whether Saint Andrews Ivy holds title to the Nevada property as nominee of Richard Shaw.

In Nevada, courts weigh at least seven factors in determining whether a nominee situation exists:

> (1) the source of the funds used to purchase the property; (2) the taxpayer's continued use of the property without the payment of a fair rental value; (3) the taxpayer's continued payment of maintenance charges and real estate taxes; (4) the nominees' acquisition of the property without any consideration, or for inadequate consideration; (5) the taxpayer's acts of holding himself out as the owner of the property; (6) the transfer of the property in anticipation of suit or the incurrence of liabilities by the taxpayer;

> and (7) the relationship between the taxpayers and the nominee, that is, whether it is a close one, such as by blood or marriage.

Nelson v. United States, 1990 WL 169245, at *3 (D. Nev. Sept. 27, 1990), *aff'd in part and remanded,* 942 F.2d 792 (9th Cir. 1991); *see also* Runvee, Inc. v. United States, 2013 WL 1249602 at *16 (D. Nev. Mar. 26, 2013) (where the "sale" of the property to the alleged nominee was nothing more than a fiction, the purchaser was the nominee of the taxpayers and was holding the property on their behalf).

Here, the Court finds that the factors weigh strongly in favor of finding nominee status, the only one that does not (the fifth), does not outweigh the others. **First**, Richard Shaw used his own money to purchase the property—payments on the mortgage, for instance, are currently being made out of his inheritance, and the later transfer of the property to Saint Andrews Ivy was for no money at all. While Richard (and Rose) did purportedly receive "TCUs" from the trust in exchange for all the property, they returned all their "TCUs" to Saint Andrews Ivy without receiving any money in return. **Second,** after the transfer, Richard Shaw had the continued use of the property without paying any rent. **Third,** the maintenance of the property is paid out of an account in the name of Cannen, LLC, for which Richard Shaw and Rose Shaw are the only signatories, and which holds funds from Richard Shaw's inheritance, meaning that Richard Shaw pays for the maintenance of the property. **Fourth**, Saint Andrews Ivy obtained the property for no consideration whatsoever: not only did it not pay any money to the Shaws for the property, but the Shaws transferred the "TCUs" they allegedly received in exchange for the property back to Saint Andrews Ivy for no money. **Fifth**, the United States admits that, apart from Richard Shaw performing all maintenance and Richard and Rose paying all maintenance fees for the property, it does not have significant evidence of Richard Shaw holding himself out as the owner of the property. **Sixth**, the property was transferred after Mr. Shaw accrued significant tax liabilities, and it appears that it was transferred because of the liabilities Richard Shaw had incurred. Moreover, Richard Shaw explicitly said that the properties were transferred to Saint Andrews Ivy "so the kids would be able to use these properties forever if Rose and I left the world, and they would have use without inheritance taxes and all that, and Vanessa Shaw

explained that the role of the Saint Andrews Ivy trustee was "to protect the trust from any third party or governmental agencies." Those statements show that the property was transferred in anticipation of liabilities. **Seventh**, all trustees and officers of Saint Andrews Ivy are Richard and Rose Shaw, or their children, so there is a close relationship between the taxpayers and the nominee.

Finally, Defendant Richard Shaw filed no opposition to Plaintiff's motion on this issue. Therefore, in accordance with the cited factors and Shaw's lack of opposition, the Court finds that Saint Andrews Ivy holds the Nevada property as Richard Shaw's nominee.

### 2. Alternatively, Saint Andrews Ivy Is Richard Shaw's Alter Ego

There is no true, uniform standard "for determining whether a corporation is simply the alter ego of its owners," Valley Finance, Inc. v. United States, 629 F.2d 162, 172 (D.C. Cir. 1980). Instead, "[t]he test is a practical one, based largely on a reading of the particular factual circumstances." Id. The Supreme Court has counseled that whether federal common law or state law governs depends upon (i) the "need for a nationally uniform body of law"; (ii) "whether application of state law would frustrate specific objectives of... federal programs," in which case the courts "must fashion special rules solicitous of those federal interests"; and (iii) "the extent to which application of a federal rule would disrupt commercial relationships predicated on state law." United States v. Kimbell Foods, 440 U.S. 715, 728-729 (1979).

The need for national uniformity and the need to further the Internal Revenue Code's objectives counsel in favor of a federal standard. See *Whether Fed. Common Law or State Law Governs Alter Ego Status*, IRS CCN CC-2012-002, 2011 WL 6257204 (Dec. 2, 2011). Meanwhile, given the similarities between the federal and Nevada standard, the use of the federal standard should not disrupt commercial relationships. *Compare* N.L.R.B. v. Greater Kansas City Roofing, 2 F.3d 1047, 1052 (10th Cir. 1993) (federal alter-ego standard) *with* Mallard Auto. Grp., Ltd. v. LeClair Mgmt. Corp., 153 F.Supp. 2d 1211, 1214 (D. Nev. 2001) (setting forth state law standard). The alter-ego inquiry goes not to the ownership of property (a question of state law), but rather to the question of who is liable for a tax. Liability for federal taxes is governed

by the Internal Revenue Code. In the Ninth Circuit, the federal common law standard has three prongs: first, "the amount of respect given to the separate identity of the corporation by its shareholders;" second, "the degree of injustice visited on the litigants by recognition of the corporate entity;" and third, "the fraudulent intent of the incorporators." Seymour v. Hull & Moreland Eng'ng, 605 F.2d 1105, 1111 (9th Cir. 1979). Here, Richard Shaw showed no respect for the "separate identity" of the corporation: Saint Andrews Ivy did not pay for the property, or the property's expenses and instead, an account in the name of Cannen, LLC held Richard Shaw's money, which was used both for the Shaws' personal expenses and to maintain the property. Moreover, the property of Saint Andrews Ivy was used by Richard Shaw free of charge. Finally, Saint Andrews Ivy did not observe corporate formalities: there were no quarterly reports, Saint Andrews Ivy did not keep regular corporate records, did not file tax returns even when it had income, and did not even have a bank account. Second, crediting the corporate form would cause injustice to the United States, given that Richard Shaw impoverished himself by transferring all his property to Saint Andrews Ivy, even as he was accruing significant tax liabilities.

Finally, there was a fraudulent intent: the transfer to Saint Andrews Ivy occurred just as Richard Shaw was accruing significant tax liabilities, and Richard Shaw outright stated that part of the reason for the transfer was to make sure his children have the "use [of the property] without inheritance taxes and all that."

But even if Nevada state law applies in considering the nominee theory (and federal common law does not), the Court would find that Saint Andrews Ivy is Richard Shaw's nominee. The Nevada alter ego standard has three factors:

> (1) the corporation . . . was influenced and governed by the person asserted to be the alter ego . . .; (2) there must be such unity of interest and ownership that one is inseparable from the another; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction fraud, or promote injustice.

Mallard Auto. Grp., 153 F.Supp.2d at 1214. The second of those three factors, regarding unity of interest and ownership between the alter ego and the corporation, itself has five subparts: "(1)

commingling of funds: (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as individual's own; and (5) failure to observe corporate formalities." Id.

First, the corporation was influenced and governed by Richard Shaw, its managing director. While Saint Andrews Ivy was purportedly a "business trust," it admittedly never conducted any business. Instead, all it did was hold the property transferred to it at inception. Richard Shaw maintained the property. Richard Shaw admitted to governing and controlling Saint Andrews Ivy, at least implicitly: when asked why the "certificate of cancellation" was filed on behalf of Saint Andrews Ivy, he stated that it was filed "so that we did not have to register, and "[w]e didn't want to pay the hundred dollars a year," when the entity wasn't doing business.

**Second**, there is a unity of interest and ownership between Saint Andrews Ivy and Richard Shaw. To the extent Saint Andrews Ivy had any funds, those funds were commingled: a bank account in the name of Cannen, LLC held Richard Shaw's money, which was used both for the Shaws' personal expenses, and to maintain the property. There was undercapitalization: no money was transferred to Saint Andrews Ivy and there were no funds available to pay for the property's purchase or maintenance. There was no unauthorized diversion of funds only because Saint Andrews Ivy did not have any funds. Richard Shaw treated Saint Andrews Ivy's assets as his own: he lived there rent free, he used all the furniture and other assets held by Saint Andrews Ivy as his own and it was his money (his inheritance) used to pay the expenses of the property. There was a failure to observe corporate formalities: Saint Andrews Ivy did not keep regular books or records, had no bank account, kept no quarterly reports, and filed no tax returns even though there was apparently some small amount of rental income.

According to the trust documents themselves and the testimony of the Shaws and the 30(b)(6) representative, the holder of the TCUs would receive proportionate distributions of the trust property when the trust was dissolved but Richard and Rose transferred the TCUs back to the trust itself. Indeed, Richard and Rose Shaw, and Vanessa Shaw, the 30(b)(6) representative, could not even state outright that Saint Andrews Ivy had beneficiaries.

**Third**, if the formation of the entity made Richard Shaw otherwise judgment-proof (as he had no remaining assets after Saint Andrews Ivy's formation), then crediting the corporate form would sanction fraud or create injustice. See Mallard Auto Grp., 154 F.Supp.2d at 1216. Here, Richard Shaw impoverished himself by transferring all his assets to Saint Andrews Ivy, meaning that the United States would be unable to collect if the corporate form is not pierced, which would sanction a fraud or injustice.

### 3. Alternatively, the Transfer of the Nevada Property to Saint Andrews Ivy, B.T. Was A Fraudulent Transfer

In the alternative, the Court finds that the purported transfer of the Nevada property to Saint Andrews Ivy was a fraudulent transfer. In Nevada, there are two ways a fraudulent transfer can be proved, either of which is satisfied here. There can be a constructive fraudulent transfer, N.R.S. § 112.180(1)(b), or a fraudulent transfer made "with actual intent" to delay, hinder, or defraud a creditor. N.R.S. § 112.180(1)(a).

First, there is a constructive fraudulent transfer where, "[w]ithout receiving a reasonably equivalent value in exchange for the transfer," the debtor "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond his or her ability to pay as they became due." N.R.S. § 112.180(1)(b)(1). Here, Richard Shaw did not receive a reasonably equivalent value of the Nevada property from the transfer (as he received no money whatsoever), and he knew he was accruing significant tax liabilities that he would not be able to pay because he impoverished himself by giving all his property to the trust.

Second, there was actual intent, as can be seen by reference to the statutory eleven-part test set forth in N.R.S. § 112.180(2). The transfer was to an insider, § 112.180(2)(a), as Saint Andrews Ivy is governed and controlled exclusively by Richard Shaw and his family. Richard Shaw retained possession or control of the property after the transfer, § 112.180(2)(b), as he still lives there and provides the funds for its maintenance. Before the transfer was made, Richard Shaw knew there was a strong possibility of suit, § 112.180(2)(d), given that he had already incurred significant tax liabilities. The transfer was of substantially all Richard Shaw's assets, §112.180(2)(e), as he agreed he owned very little after the transfer. The value of the

consideration received by Richard Shaw in exchange for the property, § 112.180(2)(h), was much less than the property was worth, as he received no money, and the TCUs he received he returned to the trust itself. After the transfer, Richard Shaw effectively became insolvent, as he had no remaining assets, but continues to owe money on mortgages, as seen by his bankruptcy petition. The transfer to Saint Andrews Ivy occurred shortly after, and shortly before, Richard Shaw incurred significant tax liabilities. There are other factors that do not necessarily weigh in favor of the United States, such as: whether the transfer was concealed, § 112.180(2)(c), whether the debtor absconded, § 112.180(2)(f), whether the debtor removed or concealed assets, § 112.180(2)(g), and whether the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. § 112.180(2)(k). However, those factors do not outweigh the other factors in determining whether the transfer was fraudulent.

Finally, Richard Shaw stated that the purpose of the trust was partly to avoid inheritance taxes, and Vanessa Shaw said that the role of the trust's trustees was to "protect the trust from any third party or governmental agencies. The Court should find that the transfer of the property to Saint Andrews Ivy was a fraudulent transfer.

**D. Foreclosure and Defendant Rose's Motion for Judgment on the Pleadings**

Further, Defendant Shaw has not directly opposed summary judgment on the Government's motion to foreclose on the Nevada Property in order to collect the tax liabilities. Given that Richard Shaw is the true owner of the property at issue, a foreclosure is the proper remedy here. 26 U.S.C. § 7403. Once it is established that the United States has liens upon certain property, the United States may foreclose the liens, sell the property, and apply the proceeds toward the taxes at issue. See United States v. Craft, 535 U.S. 274 (2002); United States v. Rodgers, 461 U.S. 677, 693-94 (1983). Under Rodgers, district courts have limited discretion to not order a foreclosure sale under 26 U.S.C§ 7403. Defendants have the burden of proof as to whether a court should use its limited discretion to not issue a foreclosure order. Rodgers, 461 U.S. at 706; United States v. Padilla, 9 2004 WL 2827891, at*1 (E.D. Cal. 2004).

Defendant Rose opposes foreclosure and asserts, contrary to her deposition testimony, that she maintains an interest in the Nevada Property. However, the Court has already found,

consistent with Rose Shaw's testimony, that Saint Andrews Ivy holds the property as nominee for Richard Shaw, alternatively that Saint Andrews Ivy is the alter ego of Richard Shaw and finally that the transfer qualifies as a fraudulent conveyance under Nevada law. Under any of these theories, even if some interest were to revert to Rose Shaw (which the Court holds that it does not), the tax lien would attach to Rose's share and foreclosure would still be the appropriate remedy.

In Nevada, under NRS § 123.220, any "property acquired after marriage 'through the toil or talent or other productivity faculty of either spouse' is community property." Randono v. Turk, 466 P.2d 218, 223-24 (Nev. 1970). The presumption that property acquired after marriage is community property "can only be overcome by clear and convincing evidence." Peters v. Peters, 557 P.2d 713, 715 (Nev. 1976). Community property is subject to community debts. See Nelson v. United States, 53 F.3d 339 at*1, 1995 WL 257884 *1 (9th Cir. 1995) (unpublished) ("The [Nevada] district court was also correct in holding that the entire proceeds from the sale of the [community] property could be used to pay [husband taxpayer's] tax liability.").

Here, when the Shaws transferred their interests to Saint Andrews Ivy, the joint tenancy was converted into a tenancy in common. See Smolen for Smolen v. Smolen, 956 P.2d 128, 130 (Nev. 1998) (joint tenancy severed when interest in residence conveyed to trust). A tenancy in common is community property under § 123.220 provided it was obtained during the marriage. See Peters, 557 P.2d at 715 ("Property held [as tenants in common] can be compatible with the concept of community property."). Accordingly, Defendant Rose's motion for judgment on the pleadings is denied. The United States may foreclose on the Nevada Property to satisfy Richard Shaw's outstanding tax liabilities.

**IV. Conclusion**

Accordingly, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment (#65) is **GRANTED;**

IT IS FURTHER ORDERED that the United States shall file a motion or motions for sale and distribution and final entry of judgment with a proposed order no later than thirty (30) days after the entry of this order;

1      IT IS FURTHER ORDERED that Saint Andrews Ivy owns the Nevada property as Richard Shaw's nominee or alter ego;

     IT IS FURTHER ORDERED that the Court finds that the transfer of the property to Saint Andrews Ivy was fraudulent;

     IT IS FURTHER ORDERED that Defendant Rose Shaw's Motion for Partial Judgment on the Pleadings (#68) is **DENIED**.

Dated this 28th day of September, 2018.

                                                                                 The Honorable Kent J. Dawson
                                                                                 United States District Judge